B. Monroe
5bm 58
125  170

WILL CASE.

## Steele, &c. *vs* Price and wife.

*Case* 17.

APPEAL FROM THE FAYETTE CIRCUIT COURT.

*Will Case.*

*Sept.* 17.

JUDGE MARSHALL delivered the opinion of the Court.

[This opinion was delivered at the Spring Term, 1844, a few days before the adjournment of the Court, and suspended until the Fall Term, when the suspension was removed.]

Case stated.

ON the 12th day af October, 1842, William Steele, of Fayette county, died childless and unmarried; and at the succeeding Nov. term of the Fayette County Court, D. L. Price and Elizabeth his wife, the latter claiming to be a principal devisee, offered a paper for probate, as containing the substance of the will of William Steele, alledging that the written will, executed by him, was lost. The draft thus propounded, contained a devise of 200

acres of the testator's tract of land, where he lived, to his niece, Elizabeth Price, *for her sole use,* to be laid off in convenient form, including his dwelling house; also of his two slaves, without naming them, and a devise of the balance of his tract of land, supposed to be 60 acres, to Brice Steele. At the succeeding December term, the will being contested, was admitted to record, as propounded, the names "Patsey and Mary," having been inserted as the two slaves devised. On appeal from this sentence, by the contesting heirs, the case was heard in the Fayette Circuit Court, in June, 1843, upon the testimony of witnesses examined in that Court; and the will was established, and admitted to record, as it had been in the County Court, except that the words "for her sole use," in the devise of the land to Mrs. Price, were rejected, and instead of the words "my two slaves Patsey and Mary," the words "my slaves Lucy, Mary and Bobb," were inserted.

From this sentence of the Circuit Court, an appeal has been taken to this Court by the heirs. And under the act of 1842, (3 *Statute Law,* 585,) the case has been heard here, and it is to be decided, not as formerly, upon the testimony of witnesses examined before us, but upon the law and *evidence* apparent in the record. As the appeal does not bring up the will itself for probate or rejection, but brings up, in substance, the question whether the Circuit Court has proceeded correctly or incorrectly in the trial and decision of that question, we have regarded the party alledging error, as holding the affirmative in this, as in other cases of appeal, without regard to his attitude upon the issue of fact in the Court below; and therefore awarded to the appellants, as in other cases, the opening and conclusion of the argument.

The 11th section of the statute of wills, (*Statute Law,* 1543,) in providing for their admission to record, says, "when any will shall be exhibited to be proved," &c., whence it might be inferred that nothing but the very writing executed or published by the party as his will, could be offered for probate; yet it has been repeatedly decided, that a will may be proved which has been lost or destroyed after the testator's death; as in the cases of *Happy's will,* (4 *Bibb,* 553;) *Payne's will,* (4 *Monroe,* 422;)

<div style="margin-note">
STEELE, &c.
*vs*
PRICE AND WIFE.

In the will cases tried in the Circuit Court, the trial is had here upon the record, without examining witnesses orally, and the party alledging error holds the affirmative, and has the opening and conclusion of the argument here.

The contents of a writing which was once valid & never revoked becomes effectual as a will, by the death of the testator, though it be not in existence at his death.
</div>

STEELE, &c.     *Baker* vs *Dobyns*, (4 *Dana*, 221.)  And it is obvious that
       *vs*
PRICE ANE WIFE. so far as relates to the 11th section, it is immaterial wheth-
er the loss or destruction of the will occurred before or
after the death of the testator, if in regard to the disposi-
tion of land and slaves, that can be called a will, which
does not exist in writing at the testator's death, when
alone a will can first become effectual as an act controll-
ing his estate.  And, as upon comparison of the first and
third sections of the statute, (*Stat. Law,* 1537–39,)
which prescribes the the modes of making and revoking
devises of land, (and by other statutes a devise of slaves
is put on the same footing,) it is manifest that the mere
destruction or non-existence of a will which once existed
in legal form, is not necessarily, and without regard to the
manner or purpose of its destruction, a revocation , and
as it is moreover manifest, that a devise once valid, and
never revoked, may become effectual as a will, by the
death of the testator ; it follows, that such devise legal-
ly made, and never revoked, may, and should, upon suf-
ficient proof, be admitted to probate and recorded, though
it be not in existence in written form at  the death of the
testator.

This conclusion, derived from a fair interpretation of
the statute, is fully sustained by the cases of *Davis* vs
*Davis*, (2 *Eng. Ecc. Rep.* 275 *;*) *Legare* vs *Ashe*, (1
*Bay's Rep.* 464,) and many other foreign cases ; and in
our own Court, by the cases of *N. Beauchamp's will,* (4
*Monroe,* 361 *;*) *Allison* vs *Allison*, (7 *Dana,* 90 *;*) the
two cases on Beall's will, of *Beall* vs *Counningham,* (1
*B. Monroe,* 399,) and (3 ·same, 392 ; and *Campbell,*
*&c.* vs *West,* (3 *B. Monroe,* 242.)   Of the six wills in-
volved in these cases, and of which none were found at the
testator's death, and some were proved to have been previ-
ously destroyed, and the non-existence of the others,
would be presumed, from their not having been found ;
four were established on the ground, that although not in
existence, they had not been revoked, and therefore re-
mained valid, and became effectual at the testator's death.
The fifth, N. Beauchap's will, was rejected, not merely
because it had been destroyed before the testator's death,
although the fact was known to him, but because it had

been revoked. "The inward intention to revoke, and outward symbol of revocation," being, in the language of the Court, "so knit together and bound by the evidence, that they could not be separated." And in the case of Campbell *vs* West, the Court refused to establish the will, not because it had been destroyed, nor because its destruction, though the testator became apprized of it, and failed to supply another, either constituted or proved a revocation, but because the application was made to a Court of Chancery, without showing any ground for its interposition.

In the case before us, not only was the original will not produced for probate, nor proved at the testator's death, but it was proved by a witness on the part of the appellees, that the testator about three weeks before his death, had told him that the will was lost, and also, in effect, that he intended to have another written just like it; and yet it does not appear that he ever made any attempt to renew the will, and it is certain that he never did renew it.

But the third section of the statute requires the revocatory acts, to which alone it gives effect, to be done by the testator himself, or to be caused by him to be done in his presence. And therefore, neither the casual loss or destruction of the will, without the agency or knowledge of the testator, nor his subsequent knowledge of the fact, nor his failure to renew the will, nor all together, constitute a statutory revocation. In the case of N. Beauchamp's will, it not only appeared that the testator was informed of the destruction of his will, but that he said he had ordered it himself; that the law would make a will for him, and he did not renew it. There was no express proof of a statutory revocation, because it was not expressly proved that the will was destroyed in the presence of the testator. But from the facts above stated, the Court say the intention to revoke must be inferred, and the same facts constituted the evidence which so inseparably knit together, and bonnd the external symbol of revocation, and the inward intention to revoke, as that the Court, on that ground, felt authorized to say that there was a revocation, though it was not proved that the

*Margin notes:*

STEELE, &c.
*vs*
PRICE AND WIFE.

A revocation must be by the act of the testator himself, or by his direction or sanction.

STEELE, &c.
vs
PRICE AND WIFE.
will was destroyed in the very presence of the testator. By what smaller amount of evidence the Court might have been brought to the same conclusion, it is perhaps impossible to say. But it is clear, that notwithstanding the destruction of the will, the Court required further evidence of the intention to revoke it, and that they did not regard the testator's subsequent knowledge of its destruction, and his failure to renew it, as alone furnishing conclusive evidence of that intention. It may, we think, be inferred, that they would not have been satisfied with these facts alone. It is certain, from the course of the opinion, that unless they had been satisfied that the will was intentionally revoked, its contents would have been admitted to record.

In the case of Campbell *vs* West, "the fact that the testator knew, or had reason to believe, that his will was destroyed, and nevertheless did not publish any other," is more directly considered; and it is there said, that "although this fact may not prove a revocation, it may tend to show that he consented to die without a will, and finally approved the destruction of that which he had once published; and the Court expressly say, they are not satisfied to decide that the decedent died intestate. It is therefore clear, that in this case, the fact referred to was not regarded as having *per se*, any technical effect, either as a revocation or as evidence of revocation; but that it was considered merely as a circumstance which might tend to show an intention to revoke; which carries the necessary implication that this tendency may be increased or diminished by other facts, and that the inference to which it leads may be confirmed or overthrown by a consideration of all the circumstances in the case. It is moreover clearly implied in the case of Campbell *vs* West, that a will may be admitted to record by the Court of probate, notwithstanding the testator's knowledge of its loss or destruction, and his failure to renew it.

And the fair deduction from both the cases, as well as from a consideration of the fact itself, is that such a failure is to be regarded at most, as only furnishing a *prima facie* presumption or inference of an intention to revoke. It follows, of course, that the rebutting evidence, which

*The failure of one who is informed of the destruction of his will, to publish another, fur-*

need not be of higher grade than that which is to be over-thrown by it, may also consist of inferences from whatever circumstances may tend to an opposite conclusion. And the cases to which we have already referred, and to which, upon this point, numerous others might be added, demonstrate that the acts and declarations of the testator himself, as being the natural and appropriate indications of his inward thoughts and intention, constitute legitimate and admissible evidence by which this inference may be rebutted.

Steele, &c.
vs
Price and wife.

nished a *prima facie* presumption of intention to revoke the will destroyed, which may be rebutted by evidence of the same grade, such as the declarations of the testator himself.

After what has been said, the difference between a failure to renew a written will, which has once existed in valid legal form, and the failure to make a will, where one has never been made, is too obvious to require comment. The one necessarily produces, and indeed constitutes intestacy. The other does not necessarily produce it, if there be other means of proving the will; but in that case, can only tend to produce it, so far as it may tend to prove the intention to revoke the will. This is the utmost effect which is given to it by the adjudged cases, or to which in point of reason or of law it can be entitled. It may, in connection with lapse of time, or other circumstances, amount to satisfactory or even conclusive evidence. But in itself, and standing alone, the mere failure for a short time, to renew a will ascertained or supposed to have been casually lost or destroyed, must be admitted to be equivocal, or at any rate, slight in its tendency to prove an intention to revoke. And it is certain, that whatever tendency it has in this respect, may be destroyed by facts going to show that the failure should be attributed to other causes than an intention to revoke, as it may be overcome by evidence tending more directly to prove that there was no such intention. If then, it be conceded, in opposition to the apparent tenor of the 3d section of the statute, that a testator after having discovered the casual loss or destruction of his will, may, without further visible act of revocation, effectually revoke it by mere adoption of the pre-existing fact, with the intention thereby to revoke the will and die intestate, and that his failure, even for a short time, to renew the will, may tend to prove this mental act of revocation; it must also be conceded, that

notwithstanding such a failure, the question of revoca-
tion, consisting not only of the external fact, but of the
inward intention, co-operating with it, is to be decided
by fair deduction from all the facts; and that if upon fair
comparison of all the facts, and the reasonable inferences
deducible from them, the mind of the Judge be not satis-
fied that there was an intention to revoke, or, at any rate,
if it be satisfied that there was no such intention, the
will, if its execution and contents be sufficiently proved,
must be admitted to record.

Recurring then to the proof, the enquiry, as substan-
tially laid down in the case of Campbell *vs* West, is,
Did William Steele ever make a valid will? What were
its contents? Did he ever knowingly destroy it, or after
having ascertained its loss or destruction, approve or
adopt that fact, with the intention to revoke the will, and
die intestate? And first, as to the execution and con-
tents of the will:

Facts appearing
in the record.
It has already been said, that William Steele died
childless and unmarried. He had lived for many years
close by his only brother, John Steele, whose daughter
claims to be the principal devisee. He was a man of in-
telligence and education, but had been for some years
before his death, addicted to frequent and deep intoxica-
tion. In 1837, about which time the will is supposed to
have been made, he was entirely competent to make and
write his own will. He was then the owner of 260 acres of
land, and nine slaves, old and young; and was free, as
he remained until his death, to dispose of them according
to his inclination, or his judgment. About 60 acres of
the land had been occupied by Brice Steele, whose rela-
tion to the decedent is not stated, for twenty years, and
continued to be so occupied until the testator's death. As
early as the year 1831, the decedent had announced to
one witness, and afterwards and before exhibiting his will,
he repeatedly announced to him and others, that he intend-
ed to give to his niece, Elizabeth Steele, afterwards Eli-
zabeth Price, the greater portion of his estate, and as he
said more specifically, to at least one of them, the 200 acres
of his land. In the year 1837, he exhibited to two of
these witnesses, and on different occasions, a paper then

in the custody of Mrs. Price, which he stated to be his will. One of these witnesses read the will through, proves that it was in Steele's hand writing, and that he said he had written it himself; and proves the two devises of the land as admitted to record in the Circuit Court, and also a devise to Mrs. Price of four or five slaves, of which he recollects the name of "Mary" only. He says the will also contained three or four other legacies in money, to the testator's other relatives, but which he does not remember. The will was afterwards shown, on different occasions, between 1838 and 1840, to two other witnesses, when the testator had it in his own possession, having taken it on one occasion out of his pocket with two or three letters. One of these witnesses read only the devise of 200 acres of land to Mrs. Price, which he proves. The other read the greater part of the will after Steele had read it all to him, and proves the two devises of the land, and that five slaves were devised to Mrs. Price, of which he remembers the names of "Lucy, Mary and Bobb," the same which were inserted in the will in the Circuit Court. And he proves expressly, that the will was signed by Steele.

According to the rule laid down in the case of Baker vs Dobyns, *supra*, and which is evidently implied in the case of N. Beauchamp's will, and is sanctioned by the practice in proving by a single witness, the execution and attestation of wills which are produced, and in proving the contents of written documents not produced, the foregoing evidence independently of the strong confirmation which it receives from other corroborating proof, must be deemed amply sufficient to establish the devises of the land and of the three slaves, as recorded in the Circuit Court. And as to publication, upon which some stress was laid in the argument ; the paper having been repeatedly and amply verified by the testator as his will, was sufficiently published as such, if indeed any other publication besides the fact of his having written it himself were necessary. Was the will, then, ever revoked ? With regard to the 60 acres of land devised to Brice Steele, the fact already mentioned shows, that there was no change of inten-

tion, and has perhaps made his title to it, independent of the establishment of the will.

To the four witnesses to whom the will had been shown, the testator in repeated conversations, coming down to within a few months before his death, continued to express the same testamentary intentions with regard to his niece and the devise to her, as were contained in the will. To one of them he said, in 1842, in reference to a house he was preparing to build on the land, that he was going to build the house for his niece, and at the suggestion of the witness, he altered the plan of some of the rooms, the better to suit her supposed convenience. To a seventh witness, he said, several years before his death, in answer to a question as to what he meant to do with his property, that he meant to give it to Mrs. Price; she had the papers. To an eighth witness, he said, a little more than a year before his death, that he had made a will, and had left the farm to Mrs. Price; and about two months before his death, the same witness heard him say he had a will. He told a ninth witness, in 1841, that he had rented out his farm for the purpose of building a house, which he intended living in till his death, and then it was to go to Mrs. Price, and that the part about Brice Steele's was to go to him. In August, 1842, he said to a tenth witness, in answer to a remark about his making brick, in substance, that the land was Mrs. Price's, and he was building the house for her. To an eleventh witness, the brick maker engaged in making the brick, he said, Elizabeth Price was to occupy the house. To a twelfth witness, he said, in September, 1842, that he had made a will a long time ago; that he had left 200 acres of land, and four negroes, to Dr. Price's wife, and was building a house for her on the land. And to a thirteenth, he said, in 1842, that he had given the land to his niece, Elizabeth Price, and was building a house on it, where he could live with her, &c.; that whether he was drunk or sober, she had always been as kind to him as a child. And others of the witnesses prove, that whether he was drunk or sober, he had always displayed the greatest affection for her.

While there is on the one side this unbroken chain of testimony from thirteen witnesses, to which that of the fourteenth might have been added, going to show the continued existence, from 1831 to some time in September, 1842, of the same testamentary intentions and the same affections, in obedience to which the will in 1837 was drawn up, and which seem to have become more fixed and intense, instead of becoming less so. There is, on the other hand, not only no evidence of any change of external relations, after the date of the will, and no visible change of the affection, and the purpose which had dictated the will; but there is not a single act or expression proved, from which it might be inferred that he felt any peculiar affection for his other relatives; or that his regard for them or his sense of duty to them, had increased; or that he desired or intended, or was willing that they should receive any part of his estate, beyond the legacies which he had left them in his will. This will, which having been made when he was fully capable of surveying, not only his estate but his relations and duties, and of considering the condition, the wants, and the merits of those who might have claims upon him, must be regarded as having embodied his settled purpose as dictated by reason, duty, and affection, was confirmed by numerous testimonies, not only of continued, but of increasing approbation, and gratification in the belief that his favourite niece would enjoy a large portion of his estate; and as this niece, the daughter of his living brother, would not be his heir, she could only be entitled to his estate after his death, under a valid will. It is in this state of the proof, under this evidence of his feelings and judgment in. regard to the will, and the disposition of his property which it directed, and with respect to this favorite niece; that we are called upon to presume, without cause or evidence of change, so sudden and so thorough a change in all the feelings, and views, and purposes of the decedent, as must have taken place before he could have determined, by the revocation of the will, to die intestate, and thereby to deprive this niece, whom he was preparing to introduce into the enjoyment of his estate even before his death, of all the right and interest which

STEELE, &c.
*vs*
PRICE AND WIFE.

she could, by any means have had after his decease.   And we are to presume this as an inference, either from the single fact that the will was not in existance at his death, when, as may be assumed, the preparations for the reception and accommodation of his niece were still going on, or we are to presume it from the single fact, that being apprised a few days before his death of the loss of the will, or not being able then to find it, he failed to renew it, or to do all that he could to have it renewed, though he declared that he intended to renew it.

Surely if his declaration, which constitutes the only direct evidence of his knowledge of the loss or non-existence of the will, and the competency of which seems to be doubted, had not been heard of in the case, and the evidence of revocation had stood as it then would have done, on the presumption arising from the fact that the will having been last heard of in the custody of the decedent, was not found at his death; it would have been more natural and more reasonable, in view of the great probability of its loss, arising from his loose habits of business, his carelessness in keeping his papers, and his frequent intoxication, (all of which are proved,) and of the extreme improbability and absence of all evidence of a change in his intentions in behalf of his niece, and of the strong testimony of facts and declarations showing the continuance of those intentions, and in view of the consequences of intestacy upon the most cherished plans of the decedent; it would have been more agreeable to nature and to reason and experience, to say that the will had been casually lost, without his knowledge, and, therefore, was not revoked, than to say either that he had knowingly destroyed it, or that having ascertained its loss or destruction, he had approved and adopted it with the determination to die intestate.   And in the cases of *Davis* vs *Davis*, (2 *Eng. Ecc. Rep.*) and *Beall* vs *Cunningham*, (1 *and* 3 *B. Monroe*,) and *Legare, &c.* vs *Ashe. &c.* (1 *Bay.*) and other similar cases, we should find ample authority for adopting, as Judges, such a conclusion from such a state of facts.

What effect then, is to be given to the fact that about eighteen days before his death, and only ten or twelve be-

fore the commencement of his last drunken frolic, which terminated his life, and which seems to have rendered him incompetent for the last week, either to make or revoke a will, he stated to the witness to whom he had last shown the will, that it was lost, and that he intended to send for the witness's father, (the first to whom he had shown it,) to write a new one just like the old one?  As to the competency and admissibility of this declaration, which have been questioned, we refer to the cases upon wills, not in existence at the testator's death, which have been before cited; and nothing need be added to what has already been deduced from them.  And as to its credibility, whatever may be said and however justly, with regard to the caution and suspicion with which the declarations of old men concerning their wills and the disposition of their property, should generally be received; there is no principle of law or of reason, which either requires or can enable the mind to resist the accumulated force of that evidence of internal feeling and intention which is furnished by the uniform and unvarying tenor of a man's conduct and conversations throughout a long series of years.  We believe this declaration, therefore, because it accords with all that we see or hear of William Steele in this record.  We believe the will was lost, not only because he said so, but because it was extremely probable that it should have been lost, and because his known intentions and affections would have prevented him from destroying it.  We believe, too, that he had but recently discovered its loss, because his latest previous declarations indicated the belief that he still had a will disposing of his property according to his wishes; and we believe that he intended to renew the will, and thus to secure beyond doubt or question, that disposition of his estate which it directed, not merely because he said so on this occasion, but because this declaration accords with all that he had before said and done upon the subject, and because so far as appears, there was no cause, nor motive, nor evidence of change.

With this additional evidence of adherence to the will, furnished by the last words of William Steele which are proved in the cause, and under the impression produced

STEELE, &c.
*vs*
PRICE AND WIFE.

by all the facts which have been noticed concurring to prove the fixedness of his purpose with regard to his es- estate, and the permanency of those affections, and of that sense of duty to which it was subservient, the mind looks for some stronger proof of change, than is to be found in the mere inaction of such a man for ten or twenty days, before it can be satisfied that within that short space of time he had abandoned his long cherished intentions, renounced a partiality which until then seemed to have constituted one of his pleasures, and to have grown stronger with the advance of time; and that determining to revoke his will and die intestate, he had resolved to deprive his favorite niece of all interest in his estate, to withdraw from her the promised evidences of his paternal care and affection, and thus, as might almost be said, to disinherit his only child; we say to withdraw from her the promised evidences of his care and affection, because independently of the express promises which might be assumed to have been made to her by depositing the open will in her custody, he gave an emphatic though silent guaranty that it should not be revoked by his act; and even in the resumption of its custody himself, under the circumstances which produced it, he renewed that solemn pledge.

If these considerations do not absolutely prove that there was no change of purpose in William Steele's mind with regard to the disposition of his estate, and therefore, that his failure to renew the will did not proceed from any such change of purpose, and could not prove it, they at least render it proper in point of reason, to resort to any other probable hypothesis which the facts may present, by way of accounting for that failure, rather than to adopt one so unreasonable in itself, and so void of all support from other facts in the case. With his habits he might have hoped that, although the will was not found where he expected to find it, it might yet be found where he might have unconsciously dropped or deposited it. Under no immediate apprehension of death, though doubtless enfeebled in mind and body by long continued habits of intoxication, and distrusting as he seems to have done, the steadiness of the hand which had written the first will, he may have failed to send for the designated

writer from mere procrastination, or from want of energy, or from forgetfulness, or because he awaited some expected opportunity of seeing him, or because, knowing that the devises of his will, and especially those on which he was most intent, were known to others and might be proved by them, he did not perceive any necessity for its immediate renewal. From some of these causes he may have failed to take measures for the renewal of the will; but where shall we find the cause which determined him to revoke it? In order to avoid an intestacy and make his will effectual, it was not necessary that he should have renewed it, or attempted to renew it, or even made any active resolve to do so. He had already made his will, and had given ample proof of subsequent approval and adherence to it. No positive act of his mind nor external indication of intention was necessary to continue it. But it could not be revoked without a positive mental act, a determination to revoke: and we look in vain for any external indication of that mental act. If he had adopted the determination to revoke the will, would he not, after having given so many proofs to the contrary, have furnished, by word or deed, some positive and unequivocal evidence of this newly formed intention? Would he have been content to leave it as mere matter of doubtful inference from this most equivocal fact of his failure to renew the will in writing? And is not his failure to make any declaration, written or verbal, of his determination to revoke, more fatal to the argument in favor of revocation, than under the circumstances of the case, his failure for ten or twenty days, to renew the will in writing, can be favorable to it?

Upon the whole case, we think the few circumstances relied on to prove a revocation, fade into utter insignificance, when brought into competition with the multiplied evidences of adherance to the will. It would be against reason to say that the strong manifestation which, through a period of many years, and including his last declaration on the subject, the testator gave of a determination to dispose of his property otherwise than the law would do, should be overcome and made nothing, and an intestacy established without necessity, by the mere fact that for a

STEELE, &c.
*vs*
PRICE AND WIFE.

few days after discovering that his will was lost, or was not where he expected to find it, he failed to renew it in writing. We are of opinion, therefore, that the fair and proper deduction from all the facts is, that he did not intend to revoke, and therefore, did not revoke the will.

And as the principal devises, those in which the testator took deepest interest, and about which he showed most solicitude, are sufficiently proved, the failure of proof as to the minor provisions of the will, should not defeat the whole by preventing the admission to record, of that which is proved; and especially as it does not appear that the establishment of the devises as proved, though it would greatly reduce the fund to be distributed, will affect the relative proportions which the heirs will receive, since Mrs. Price is not an heir and Brice Steele is no where stated to be one. *Offutt* vs *Offutt*, (3 *B. Monroe*, 162,) favors this conclusion, and it conforms to the practice as understood in the English Courts of probate, in establishing wills of personalty, without regard to the question of their sufficiency as wills of the realty.

*Where a will has been destroyed, and is only proved as to some of the devises, it may be established so far as proved.*

If Brice Steele be not an heir, and there be but three, those three, of whom two only oppose the will, would certainly get more by the distribution of the estate left for distribution, after the partial probate of the will, than they would get by the whole will, if the whole were proved; and this would probably be the case even if Brice Steele be an heir, since the devise to Mrs. Price is also cut down by the failure of proof, and the distributable fund is thus increased. For although there is proof that five slaves were devised to her, yet as the devise was specific of certain slaves by name, and as a devise of the same number, without designation, would give an interest substantially different, this devise cannot be established by mere proof of the number, but only by proof of the names of the slaves devised, derived from an inspection of the will itself by the witness. No error has, therefore, been committed in this respect, to the prejudice of Mrs. Price.

*A devise which is of specific articles, (slaves,) made by a will which has been lost or destroyed, cannot be established as to any except those whose names are proved to have been in the will.*

It is contended on the other hand, that the Circuit Court had no right, in a case coming before it by appeal, to increase the devise of the slaves from two to three, and

*Where a lost will has been established by the*

on this ground a reversal of the sentence of probate is finally urged. Upon this point, we have been referred to no authority, and perhaps there is none directly in point. But the case of *Beall* vs *Cunningham*, (1 *B. Monroe*,) would seem to imply that on an appeal from the County Court to this Court, to reverse a sentence of probate under the former law, a paper, or the contents of a paper might have been offered in this Court and established, though it were offered here for the first time; and the Court declined establishing the paper as a will, in that case, apparently because, as it had not been offered for probate in either Court, and therefore, its validity and contents had not been formally litigated, it was deemed unsafe and improvident to establish it upon the proof incidentally made upon the question of recording another paper which had been admitted to record in the County Court. But in the present case, the whole proof related to the same will; there was no attempt to defeat the probate of one will by showing that another was afterwards executed; but the only question was as to the original validity and contents, and revocation of the same written will. And as we cannot suppose that the draft that was offered, could have restricted the general power of the County Court to enquire and determine what were the real contents of the lost will, and to record them according to the proof; so we suppose, the Circuit Court, becoming by the appeal possessed of the same power and jurisdiction to enquire and determine what were the contents of the will, and to establish them upon original proof delivered before it, was not restricted to the establishment or rejection, either of the original draft as presented in the County Court, or of the will as therein recorded.

Wherefore, the judgment and sentence of the Circuit Court establishing and recording the will of William Steele is affirmed, and the cause is now remanded with instructions.

*Crittenden and Robertson* for appellants: *Clay, Robinson & Johnson, and Woolly* for appellees.

Vol. V.                    10

Steele, &c.
*vs*
Price and wife·

Circuit Court on appeal, to a greater extent than the same paper was established by the County Court, it constitutes no cause for reversal of the decision of the Circuit Court, if their decision is sustained by proof.