BRADWAY *v.* THOMPSON.

Opinion delivered June 30, 1919.

1.  LOST WILL—ESTABLISHMENT OF—CHANCERY JURISDICTION.—It is proper to bring an action to establish a lost will, in the chancery court.

2.  LOST WILL—PROOF OF CONTENTS.—Under Kirby's Digest, section 8065, "no will of any testator shall be allowed to be proved as a lost or destroyed will, unless the same shall be proved to have been in existence at the death of the testator, or be shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions be clearly and distinctly proved by at least two witnesses, a correct copy or draft being deemed equivalent to one witness."

3.  LOST WILL—PROOF OF EXECUTION.—The evidence *held* to show that deceased had executed a will, in accordance with the formalities required by law, and that a carbon copy of a will introduced and offered for probate was a true copy of the will which had been executed by the testator.

4.  EVIDENCE—ATTORNEY AND CLIENT—PRIVILEGE—DRAWING WILL—PROOF OF LOST WILL.—An attorney prepared a will for deceased, which it was proved was properly executed and witnessed. After

deceased's death the will could not be found. In an action in equity to establish the contents of the lost will, the attorney who drew deceased's will explained its contents to him, and was present at its execution, is competent to testify as to all these facts.

5. LOST WILL—POSSESSION OF TESTATOR—PRESUMPTION OF DESTRUCTION.—Where a testator, after executing a will, kept the same in his possession, but after his death the will could not be found, the presumption exists that deceased had destroyed the will, but this presumption is rebuttable by testimony that the testator had not revoked his will.

6. LOST WILL—PRESUMPTIONS—LAST POSSESSION—DECLARATIONS OF DECEASED.—Where the execution of a will is properly shown and its provisions established, and the will was last seen in the testator's possession, his declarations tending to show that he has or has not destroyed it, or which show that it was not in existence at his death, are admissible to strengthen or to rebut the presumption of revocation which arises from its disappearance.

7. LOST WILL—PROOF OF DESTRUCTION BY MEMBER OF HOUSEHOLD—OPPORTUNITY.—Deceased made a will which, could not be found after his death shortly thereafter. Deceased told friends the exact place where he kept the will, and these friends told a relative of deceased, who was in and out of his house at all times. *Held,* opportunity to destroy a will is not sufficient testimony to establish that fact, but it is a circumstance to be considered in determining whether the will was in existence at the time of the death of the testator, or had been destroyed during his lifetime.

8. LOST WILL—ESTABLISHMENT—DUTY OF CHANCELLOR.—In an action in equity to establish a lost will, when the chancellor is satisfied that the original will was lost, and that a copy should be admitted to probate, it is not indispensable that he should determine what became of the missing document; it is enough that he find that it was not canceled or revoked by the testator.

9. LOST WILL—ESTABLISHMENT—FINDINGS OF CHANCELLOR.—In an action to establish a lost will, *held,* a finding by the chancellor that the original of the will was not revoked, but lost, and the admission of a copy to probate, was not against a preponderance of the testimony.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

STATEMENT OF FACTS.

This is a suit in chancery to establish a lost will by parol testimony of its execution and contents to the end that it may be duly admitted to probate.

On the 16th day of May, 1918, Joseph Kendrick executed his will in the city of Little Rock, Arkansas, and retained it in his possession. He died on July 26, 1918, in the city of Little Rock where he had resided for many years and where all his property was situated. After his death his will could not be found, and this suit was brought by the appellees, who are the trustees named in the will, against the appellants, who are the administratrix and sole heirs at law of said Joseph Kendrick, deceased.

Miss Fannie Mitchell testified substantially as follows:

I have known Mr. Joseph Kendrick since I was a child and he was always fond of children. Mr. Kendrick came to my mother's home in Little Rock and consulted with me about making his will. He said that he wanted to leave his property to charity; that he was getting old and his health was failing. After studying about the matter a few days I suggested to him to leave his property to a children's hospital. Mr. Kendrick approved of the plan and wanted me to write his will. He gave me a memorandum of the terms of his proposed will. He wanted Henry Condell, a nephew of his wife, to have a certain lot in the city of Little Rock. He wished to leave to Mrs. Anna Bradway, a niece, the interest on $2,000 so long as she should live and after her death the $2,000 was to be added to the hospital fund. The rest of the property was to be left for the erection of a hospital for children. After studying over the matter I told Mr. Kendrick that I could not write a will and persuaded him to go to my brother-in-law, Ashley Cockrill, to have him write the will. Mr. Kendrick was very secretive about the matter and only consented to do so after some persuasion on my part and the promise that Mr. Cockrill would keep the matter secret. Mr. Kendrick always expressed great love and admiration for Henry Condell. I made an appointment with Mr. Cockrill for him and went with Mr. Kendrick to his office. The will was drawn and read over to him by Mr. Cockrill and Mr. Kendrick

expressed great satisfaction about the matter. Mr. Cockrill handed the will to Mr. Kendrick and told him to put it in a safe place. Mr. Kendrick offered to pay Mr. Cockrill for writing the will, but I told him no, that Mr. Cockrill did not want any pay for it under the circumstances. After we left Mr. Cockrill's office Mr. Kendrick again expressed great satisfaction about the matter. I went to my place out in the country and did not hear anything more about Mr. Kendrick until a few days before his death when I learned that he was seriously ill at a local hospital. I went there to see him and Mr. Kendrick looked like he wanted to say something to me privately. The nurse was present in the room. Finally I leaned over him and said, ''Mr. Kendrick, have you done anything that you wish me to undo?'' I was referring to his execution of the will and think he so understood me. Mr. Kendrick replied, ''No, Miss Fannie, not that; I am perfectly satisfied with that.'' Just at this time his physician came into the room and I did not get to talk with him further. He died in a few days thereafter.

Effie Jordan testified as follows: I am an expert stenographer and Mr. Ashley Cockrill dictated to me the will of Joseph Kendrick which I took down in shorthand and afterwards transcribed, making one carbon copy. I delivered both the original and the carbon copy to Mr. Cockrill. On the morning of May 16, 1918, Mr. Joseph Kendrick came to the office. In a short time Miss Fannie Mitchell came in and went into Mr. Cockrill's office where the three remained for a half hour or more. Then Mr. Cockrill came out of his private room looking for witnesses to the will. He first spoke of using me as one of the witnesses but got Mr. Sid Redding and Mr. Will Akers as witnesses to the will. I attach to my statement the carbon copy of the will executed by Mr. Kendrick on that morning. The interlineations and changes are in the handwriting of Mr. Cockrill. At his request some time afterwards I rewrote the will from my stenographic notes without using the carbon copy and attached this also to my statement. Mr. Cockrill gave Mr. Ken-

drick the original will inclosed in a long envelope with "Cockrill & Armistead" on the left hand corner. He put the carbon copy which I have exhibited with my statement in an iron safe in his office where it has since been kept.

Ashley Cockrill testified: I dictated the will of Mr. Joseph Kendrick to Miss Effie Jordan, my stenographer, and she wrote it on the typewriter making an original and a carbon copy. She brought them both into my private room and put them on my desk the day the will was executed. Mr. Joseph Kendrick signed the will by mark. His signature was written by W. G. Akers who attested it as a witness. The will was signed by W. G. Akers and Sid B. Redding as witnesses. The will as signed is exactly as shown by the carbon copy attached to the statement of Miss Jordan with these exceptions. On the first page of the will I filled in blanks with a pen the word "executrix" in two places. On the second page, in the three blanks intended for the names of the trustees I wrote with a pen E. G. Thompson, W. W. Wilson and C. H. Rosseau. On the third page near the middle, the word "whether" was stricken out with a pen and the word "and" was stricken out and the word "or" written above it. On this page I also wrote in a blank intended for the name of the executor or executrix, Fannie Mitchell and "rix" on the end of the typewritten "execut." I made an effort to keep an exact copy by filling in with a pencil in the copy the same words that were put in the original with the pen, but I neglected to write the name of Fannie Mitchell executrix as was done in the original. I know the carbon copy with the exception of leaving out the name of Fannie Mitchell is an exact copy of the will as executed. I explained the will fully to Mr. Kendrick and he read it line by line before he executed it. Mr. Kendrick fully understood the terms of the will before he executed it. After the will had been executed I folded it up and put it in an envelope with the name "Cockrill & Armistead, Little Rock, Arkansas," on the left hand corner. Mr. Kendrick left the office with the will in his possession and I never saw him again.

Sid B. Redding and W. G. Akers both testified that they signed the will as witnesses thereto at the request of Joseph Kendrick. Mr. Akers said he wrote the name of Joseph Kendrick and at the time Mr. Kendrick stood right behind him and placed his hand on the pen when the cross to his signature was made. They said that Mr. Cockrill took up the will and stated the various provisions in it before it was signed. They recollected that there was a devise of a house and lot in the city of Little Rock to a nephew of Mr. Kendrick's deceased wife and the interest on a certain sum of money was to be paid Mrs. Anna Bradway; that Joseph Kendrick said that he had done for his relatives all that he felt that he should do and that he left the balance of his estate to be used in erecting a charity hospital for needy children. Miss Fannie Mitchell was appointed executrix of the will and E. G. Thompson, C. H. Rosseau and W. W. Wilson were to act as trustees in administering the trust.

Henry Condell testified: I was a nephew of Joseph Kendrick's wife and at the time of the trial a sergeant in the United States army. Prior to his death I knew Joseph Kendrick as long as I could remember any one. I am past twenty-eight years old. I saw Mr. Kendrick about five days before his death at his home in the city of Little Rock. At that time I was on a week-end pass from Camp Beauregard and could only stay with Mr. Kendrick one day and one night. At that time Mr. Kendrick was not confined to his bed but was confined to the house. He told me that he had done what he had wanted to do for a long time—that he had made his will, but he did not tell me the provisions of his will. Before this time Mr. Kendrick had told me that he wished he had made his will. He had, also, offered to deed me a house and I said, "Uncle Joe, I do not think that is the right thing for you to do in your old age. When you are done with your property, it is your privilege to do what you please with it."

C. H. Rosseau testified: I have lived in Little Rock about thirty-seven years and knew Mr. Kendrick about

thirty-five years before he died. I always thought that
Mr. Kendrick regarded me as one of his best friends.
Mr. Kendrick was sick from the first day of June until
the 26th day of July, 1918, and I saw him every day but
one during that time. He was not confined to his bed or
even to his house during all of this time. Mr. Kendrick
first told me in the presence of my wife that he had made
a will and would show me where he he kept it when I
came over to his house. He told me that Mr. Cockrill
had made his will for him, and he wanted me to know
where he kept it in order that if anything happened to
him I might take care of the will for him. In a few days
after the first of June I went over to Mr. Kendrick's
house and he showed me where he kept his will in a
drawer to a spool case in a little room next to his bath
room. The drawer containing the will was locked and
he showed me where he kept the key hanging behind a
little frame near the spool case. He showed me the en-
velope and the envelope had Mr. Cockrill's name on the
corner of it. Mr. Kendrick told me that he expected
some of his relatives would be much disappointed when
they saw his will, but that he had a right to make it to
suit himself. He spoke of the will as being in existence
and being in the envelope which he showed me. Mr. Ken-
drick spoke to me about the matter again about a week
before he went to the hospital. He again spoke of the
disappointment of his relatives at its terms, but felt that
he had a perfect right to make it just as he wanted. Mr.
Kendrick was taken to the hospital on Monday and died
early on the following Friday morning. On Tuesday
Mr. Robinson, another old friend, and myself went to
the hospital to see Mr. Kendrick. Mr. Robinson asked
me if I could do anything for him and he replied: "Not
a thing that I know of; everything is all right as far as I
know." These are his words as nearly as I can repeat
them. Mr. Kendrick was buried on Saturday. On Sun-
day I told Mrs. Bradway that I would come over on Mon-
day, and we would get Mr. Kendrick's will. I told her
the will was in the drawer of the spool case when I last

saw it. On Monday morning we looked through the spool case and could not find the will. I heard my wife talking to Mrs. Bradway about the will over the telephone before Mr. Kendrick died. After a little hesitation in the conversation, she told Mrs. Bradway where the will was. We were not able to find the will after Mr. Kendrick's death.

Mrs. C. H. Rosseau testified: I heard Mr. Kendrick talking to my husband about having made a will and the place where he kept it. When Mr. Kendrick decided to go to the hospital I spoke to Mrs. Bradway about it and asked her if she thought it would be safe to leave it there. Mrs. Bradway said she would not disturb it or do anything with it until the proper time came. At that time Mrs. Bradway knew where the will was kept. Previously I had told Mrs. Bradway that Mr. Kendrick had made a will.

It was also shown that Joseph Kendrick was a man of positive character and very slow to change his mind. He was very secretive and at his death had real estate valued at between forty and fifty thousand dollars. During his lifetime he gave Mrs. Bradway a house and lot in the city of Little Rock and had also given her daughter money to obtain a business education.

The different relatives of Joseph Kendrick were placed on the stand and all testified that they did not know anything about him making a will and that they did not destroy his will.

Mrs. Anna Bradway testified: I lived close to Joseph Kendrick for five years before he died. I was in and out of his house every day. I cleaned up the house and cooked his meals. When he was not able to come to my house for them I took them to him. He never mentioned to me the making of a will, but frequently told me that he would remember me in his will. This I took for a joke. I never had anything to do with tearing up the will. Mrs. Rosseau did not tell me where the will was except that she said it was in the house.

Other facts will be referred to and stated in the opinion.

The chancellor found the issues in favor of the appellees and decreed that the paper presented to the court should be established and proved as the last will and testament of Joseph Kendrick, deceased.

*R. M. Mann, Murphy & McHaney, L. C. Maloney* and *Carmichael & Brooks,* for appellant.

1. Two witnesses are necessary to establish contents of lost will. Kirby's Digest, § 8065; Revised Stat. § § 48-51; Gould's Digest, § 51, under Wills & Testaments (ed. of 1858) and § 5816 (ed. of 1874); Mansfield's (1884 ed.), § 6547; S. & H. Dig. (1894), § 7445; So., § 8065. Kirby's Digest must be an error in saying one witness. Our statute is taken from the New York statute.    See Rev. St. of N. Y. (5 ed.), p. 144; 91 Am. Dec. 89; 76 N. E. 767.

The testimony of Miss Jordan, Mr. Cockrill, Mr. Akers and Mr. Redding goes only to the correctness of the copy and that no witness testified as to the provision of the will independently nor without the aid of the copy. None of their testimony fulfills the rule as laid down in the law. 76 N. E. 767. An attorney who drafted the will is not a competent witness. *Ib.;* 6 Am. St. Rep.; 5 Redf. Sur. (N. Y.) 372; 63 Atl. 247; 23 A. & Eng. Enc. Law (2 ed.) 114; 63 Atl. 250.

2. The leading case in this country on the admissibility of the declarations of the testator to prove a lost will, made either before or after the making of a will as to whether the will was genuine, or to take the place of two witnesses, to show the intention of the testator, is 180 U. S. (45 Lawy. ed.), 663, where it was held they were not, unless part of the *res gestae.* 60 Ark. 301 is cited; 74 *Id.* 216. Declarations of the testator are mere hearsay evidence and not competent. Borland on Wills, 92.

Appellee's case here is almost entirely of declarations of intention, clearly not competent. *Supra;* 38 L. R. A. 453; 76 N. E. 767; 122 Ark. 407; 107 Am. St. 439-

445; 68 N. Y. 46; 110 Am. St. 457; 13 Col. 546; 22 Pac. 898.

3. The presumption is that the will was destroyed by the testator with the intention of revoking it and must be overcome by evidence, strong, positive and free from doubt. 104 N. W. 403; 128 Ark. 273; 1 Alexander on Wills, 747, § 550; Schouler on Wills (5 ed.), § 402; Borland on Wills, p. 96, § 28; 113 Ga. 795; 39 S. E. 500; 84 Am. St. Rep. 263; 46 Atl. Rep. 521.

It was shown that the testator had at all times access to his will and it was clearly proved that none of those interested destroyed it. The presumption that the testator destroyed it is clear. See 110 N. Y. 481; 6 Am. St. Rep. 405. The Collier case, *supra,* is very similar to this. See also 50 Neb. 290; 38 L. R. A. 433 and note; 73 Ark. 20; 119 *Id.* 128. The declarations of the testator were not competent and it was error to admit them. *Supra.* In all other respects the evidence fails to meet the requirements of the law as stated above. As to the effect of mere opportunity to destroy a will as evidence of fraudulent destruction, see note to 110 Am. St. Rep. 453; 22 S. C. 187; 107 Am. St. 439-442.

The burden was on proponent to establish the will and overcome the presumption of law that the testator destroyed it to revoke it. 38 L. R. A. 484, note and cases *supra.*

*Rose, Hemingway, Cantrell & Loughborough* and *Cockrill & Armistead,* for appellees.

1. The finding of the chancellor that the will was in existence at the death of the testator and lost by accident or fraudulently destroyed by someone else is amply supported by the testimony. 185 S. W. 258. The presumption in favor of the chancellor's findings outweighs the presumption that the testator destroyed the will. 33 A. & E. Enc., p. 148.

The question at issue is not whether Mrs. Bradway destroyed the will, but really whether the testator changed his mind and destroyed it. It is immaterial whether

someone else fraudulently destroyed it and who that person was, or whether the will was still in existence at his death and lost. The alternative allegations in the complaint were permissible because under either of them the opposite party would be equally liable. 103 N. Y. S. 829; 16 Cyc. 239; 31 *Id.* 74.

If the facts justify a finding either that the will was destroyed by some one other than the testator, or was simply lost, then the decree should be affirmed. The chancellor found merely that the testator did not destroy it but died intending and believing it to be in existence. He did not expressly find whether it was destroyed by some one or was simply lost. If the facts justify either conclusion, then the decree is right. The chancellor's reasons are only persuasive but they should be very helpful to this court. The evidence justifies his conclusions and they should be upheld. 46 Atl. 519 is not this case but the reverse. The other cases cited by appellant are entirely different from this and do not apply. See 11 Biss. (U. S.) 256, a leading case; 5 B. Mon. (Ky.) 58, also a leading case; 96 N. W. 395; Schouler on Wills (2 ed.), § 402; 22 S. C. 187; 110 N. Y. 481; 18 N. E. 110. The evidence is ample to support the finding that the will was lost by accident. Whether so lost or destroyed by others designedly is equally fatal to contestant. The declarations of the testator were admissible as to the existence or not of the will and are abundantly sustained by competent testimony and adjudications. 11 Biss. (Ky.) 256-260; Fed. Cases No. 13, 194; 95 Wis. 121; 70 N. W. 61; 67 *Id.* 12, and cases cited; 70 *Id.* 61; 25 Atl. 558; 3 Grant's Cases, 140. The contention of the plaintiff that the concealment or destruction of the will was done or procured by the fraud of some third person is not proven. It must be affirmatively shown, as it is never presumed. 163 Pa. St. 201; 29 Atl. 919. Every criterion points to the conclusion that the testator did not destroy his will and the chancellor so found and his finding should not be disturbed.

2. On appeals in chancery cases questions as to competency of witnesses will not be considered, as it is presumed that only competent testimony was considered. 76 Ark. 153; 76 *Id.* 252. The declarations of the testator were competent. Cases *supra.* See also 40 Cyc. 1317 and note 461; 30 Cyc. 1316; 23 A. & E. Enc. 149-150, and cases cited, New York alone being cited as *contra;* 134 Mass. 252; 142 Ind. 55; 47 Ohio St. 325; 67 N. W. 12; 18 *Id.* 734; Cassaday on Wills, § § 384-390; *Ib.,* § 311-313; *Ib.* § § 314-320, 356-7.

3. The contents of the lost will are sufficiently proved. 63 Atl. 247 cited by appellant is not in point. The requirements of the statute is answered if there were two witnesses to the will; here there were *three.* 13 Col. 546. See also 23 A. & E. Enc. Law 144; 177 Mass. 238; 155 Col. 626. Here the entire contents of the will were clearly and distinctly proved and the case should be affirmed.

HART, J., (after stating the facts). (1) Chancery was the proper forum in which to bring the suit. Section 8062 of Kirby's Digest provides that whenever any will shall be lost or destroyed by accident or design, a court of chancery shall have the same power to take proof of the execution of such will, and to establish the same, as in the case of lost deeds. The power of a court of chancery to establish lost instruments is one long recognized and the practice under it requires that all those interested in the deed or will should be made parties and have notice of the proceeding. *Waggener et al.* v. *Lyles et al.,* 29 Ark. 47, and *Dudgeon* v. *Dudgeon,* 119 Ark. 128.

(2) Sections 48-51 of the Revised statutes, now section 8065 of Kirby's Digest, reads as follows:

"No will of any testator shall be allowed to be proved as a lost or destroyed will, unless the same shall be proved to have been in existence at the death of the testator, or be shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions be clearly and distinctly proved by at least two witnesses,

a correct copy or draft being deemed equivalent to one witness.''

(3) The first question for our consideration is whether or not the execution and contents of the will are established according to the provisions of this statute. We think the proof clearly shows that this question should be answered in the affirmative. Mr. Cockrill dictated the will to his stenographer. She took it down in shorthand and transcribed her notes on the typewriter, making the original draft of the will and a carbon copy of it at the same time. She exhibited the carbon copy with her deposition and testified that it was the copy she made when she transcribed her stenographic notes as dictated to her by Mr. Cockrill. Mr. Cockrill identified the copy as being an exact copy of the original with the exception of filling certain blank spaces with the name of the executrix and the names of the trustees. He stated that he filled in the blanks with these names in the original with a pen and in the copy with a pencil.

Thus it appears from his testimony that the copy exhibited with the deposition of the stenographer was an exact copy in all respects of the original will. It appears from the testimony of the stenographer that the copy was an exact one in all respects except that in transcribing the will she left a blank space for the name of the executrix to be inserted and also for the names of the trustees. It appears from the testimony of both these witnesses that as far as the devises and bequests are concerned the carbon copy exhibited is an exact copy of the will executed by Joseph Kendrick.

In addition to this Miss Fannie Mitchell testified that Joseph Kendrick stated to her in detail how he wanted his property disposed of and that she at the time made a written memorandum from his dictation. She refreshed her memory from this memorandum and testified in detail about how Joseph Kendrick had directed his property to be disposed of in his will. Her testimony in this regard was in all essential respects similar to the disposition of his property as shown by the carbon copy

of the will. She testified that the memorandum she had written down at the time from his dictation showed that he wanted to give a house and lot in the city of Little Rock to Henry Condell. She gave the number of the lot. She testified further that Mrs. Bradway was to have the interest on $2,000 in money and that the principal at her death was to go to the establishment of an orphan's hospital; that all the balance of his property which was estimated at about $40,000 was to be used in erecting a hospital for orphan children. She stated further that the will was prepared by Mr. Cockrill from the memorandum which she had furnished him. The witnesses to the will, also, remembered that he had devised a house and lot to Henry Condell and the interest on a certain sum of money to Mrs. Bradway. They did not remember the amount. They stated that the residue of the estate was to be given to C. H. Rosseau, E. G. Thompson and W. W. Wilson in trust to erect a hospital for orphan children. All the above named witnesses except the stenographer, who was not present at the time, testified that the will was read over line by line to Joseph Kendrick and carefully explained to him before he signed it. He expressed himself as greatly pleased and left the office with the will in his hand. There is no testimony tending to show that he ever executed but one will.

It is shown by the testimony of disinterested witnesses that he executed this will in the office of Ashley Cockrill. These witnesses also clearly established the provisions of the will. Therefore we are of the opinion that the execution of the will and its contents have been clearly and distinctly proved with the formality and solemnity prescribed by the statute.

(4) Ashley Cockrill, the attorney who prepared the will under the instructions given him by the testator, was one of the witnesses to prove the execution of the will and its provisions. It is true subdivision 5 of section 3095 of Kirby's Digest provides that an attorney shall be incompetent to testify concerning any communication made to him by his client in that relation or his

advice thereon, without the client's consent. But the privilege in the statute is simply declaratory of that existing at common law. It is strictly personal and may be waived by the client. The waiver may be express or implied. The attorney was employed to draft the will in statutory form and the object of it was to enable the testator to dispose of his property according to his own wishes. While the testator lives, the attorney drawing his will would not be allowed, without the consent of the testator, to testify to communications made to him concerning it, or to the contents of the will itself, but after his death, and when the will is presented for probate the reason for the rule ceases and public policy requires that the attorney should be allowed to testify in order that the will of the testator may be carried out according to his intentions. A different result would be inconsistent with the objects of the will and in direct conflict with the reasons upon which the privilege is founded. *Glover* v. *Patten,* 165 U. S. 394; *In re Young's Estate* (Utah), 14 Ann. Cas. 596 and case note; *Doherty* v. *O'Callaghan,* 157 Mass. 90, 31 N. E. 726, and *In re Layman's Will* (Minn.), 42 N. W. 286.

In discussing the question of privileges as applicable to an attorney in case of will contests, Professor Wigmore said: ''But for wills a special consideration comes into play. Here it can hardly be doubted that the execution and especially the contents are impliedly desired by the client to be kept secret during his lifetime, and are accordingly a part of his confidential communication. It must be assumed that during a part of that period the attorney ought not to be called upon to disclose even the fact of a will's execution, much less the tenor. But, on the other hand, this confidence is intended to be temporary only. That there may be such a qualification to the privilege is plain.'' 4 Wigmore on Evidence, section 2314.

At the conclusion of the section the learned author said: ''As to the tenor and execution of the will, it seems hardly open to dispute that they are the very facts

which the testator expected and intended to be disclosed
after his death; and, with this general intention covering
the whole transaction, it is impossible to select a circum-
stance here or there (such as the absence of one witness
in another room) and argue that the testator would have
wanted it kept secret if he had known that it would tend
to defeat his intended act. The confidence is not appor-
tionable by a reference to what the testator might have
intended had he known or reflected on certain facts which
now bear against the will."

(5)   Joseph Kendrick kept the will in his possession
and after his death a diligent search was made for it and
it could not be found. The presumption is that he de-
stroyed it with the intention to revoke it, but the pre-
sumption may be rebutted. 40 Cyc., p. 1281; Schouler on
Wills, Executors and Administrators (5 ed.), vol. 1, sec.
402; and Underhill on Wills, vol. 1, sec. 272.

(6)   According to the uniform current of decisions
the fact that a will which is proved to have been properly
executed by the testator, and which was last seen in his
custody cannot be found at his death, raises a presump-
tion that it was destroyed by him with the intention of
revoking it. It is equally well settled that the presump-
tion may be rebutted by evidence that the testator has
not revoked his will. This brings us to the question of
whether or not the declarations of the testator may be
received for that purpose. Although there is some con-
flict among the authorities upon this question, the great
weight of authority is that, if the execution of a will is
properly shown, and its provisions established, and the
will appears to have been last seen in the possession of
the testator, his declarations tending to show that he has
or has not destroyed it, or which show that it was not in
existence at his death, are received to strengthen or to re-
but the presumption of revocation which arises from its
disappearance. Underhill on Wills, vol. 1, sec. 277;
Schouler on Wills, Executors and Administrators (5 ed.),
vol. 1, sec. 403; 40 Cyc., p. 1317; Jones Commentaries on
Evidence, vol. 3, par. 484; *Weeks* v. *McBeth,* 14 Ala. 474;

*Spencer's Appeal,* 77 Conn. 638, 60 Atl. 289; *Patterson*
v. *Hickey,* 32 Ga. 156; *McDonald* v. *McDonald,* 142 Ind.
55, 41 N. E. 336; *Steel* v. *Price* (Ky.), 5 B. Mon. 58;
*Collaghan* v. *Burns,* 57 Me. 447; *Boyle* v. *Boyle,* 158 Ill.
228; *Pickens* v. *Davis,* 134 Mass. 252, 45 Am. Rep. 322;
*Ewing* v. *McIntyre,* 141 Mich. 506; *Tucker* v. *Whitehead,*
59 Miss. 594; *Williams* v. *Miles,* 68 Neb. 463; *Hildreth* v.
*Schillenzer,* 10 N. J. Eq. 196; *Behrens* v. *Behrens,* 47
Ohio St. 323, 21 Am. St. Rep. 820; *Gardner* v. *Gardner,*
177 Pa. St. 218, 35 Atl. 558; *Banskett* v. *Keitt,* 22 S. C.
187; *Allen* v. *Jeter* (Tenn.), 6 Lea, 682; *Tynan* v. *Pas-
chal,* 27 Tex. 286, 84 Am. Dec. 619; *Yerby* v. *Yerby* (Va.),
3 Call. 334, and *In re Valentine,* 93 Wis. 45.

In *Reel* v. *Reel,* 8 N. C. 248, at p. 268, Judge Hender-
son sums up the conclusion of the court in the following
strong language: "To our minds, to reject the declara-
tions of the only persons having a vested interest and
who was interested to declare the truth, whose fiat gave
existence to the will, and whose fiat could destroy, and in
doing the one or the other could interfere with the rights
of no one, involves almost an absurdity; and (with due
deference to the opinions of those who have decided to
the contrary, we say it) they are received, not upon the
ground of their being a part of the *res gestae,* for
whether they accompany an act or not, whether made
long before or long after making the will, is entirely im-
material as to their competency; those circumstances
only go to their weight or credit with the tribunal which
is to try the fact, and the same tribunal is also to decide
whether the declarations contain the truth or are decep-
tive, in order to delude expectants and procure peace."

Joseph Kendrick executed the will on the 16th day
of May, 1918, and died July 26, 1918, in the city of Lit-
tle Rock where he had lived for many years. He carried
the will home with him and placed it in a drawer for safe
keeping. He expressed great satisfaction that he had
executed the will both at the office where it was executed
and just after he left there. In a short time thereafter
he told C. H. Rosseau, a friend of 35 years standing,

about the execution of the will and the likelihood of its displeasing his relatives. He stated to his friend that he thought he had a right to dispose of his property as he wished, notwithstanding his action would be disapproved by his relatives. He told Mr. Rosseau in the presence of his wife where he kept his will and that the first time Rosseau was at his house he would show him the place where he kept it, so if anything happened to him, Rosseau would know where to find the will. Kendrick was old and was fast losing his health at this time.

Mrs. Rosseau corroborated the testimony of her husband as to the satisfaction Mr. Kendrick expressed at having made a will. At first she also corroborated her husband to the effect that she told Mrs. Bradway where Mr. Kendrick said he kept the will. After Mrs. Bradway had denied that she had any knowledge where Mr. Kendrick kept the will and denied that Mrs. Rosseau had told her where he said he kept it, Mrs. Rosseau testified that she could not remember whether or not she had told Mrs. Bradway where Mr. Kendrick said he kept the will, but she did tell Mrs. Bradway that he had executed a will. Mr. Rosseau said that his wife did tell Mrs. Bradway over the telephone where the will was kept and that he told her after the death of Mr. Kendrick where he had kept it. So it may be taken as established by disinterested witnesses that Mrs. Bradway knew before Mr. Kendrick died that he had made a will and by one of them that he told her where it was kept after Mr. Kendrick's death. Mrs. Bradway was in and out of the house every day and had the opportunity to have searched for and found it before Mr. Kendrick's death even if Mrs. Rosseau did not tell her where it was kept.

(7) Of course opportunity to destroy the will is not sufficient testimony to establish that fact, but it is a circumstance to be considered in determining whether the will was in existence at the time of the death of the testator or had been destroyed during his lifetime. Mr. Kendrick only lived four days after he was carried to the hospital. Mr. Rosseau and another old friend named Rob-

inson visited him while there. Mr. Rosseau asked Mr. Kendrick if he had left anything undone which a friend could do for him and he remarked that he had left everything all right.

Miss Fannie Mitchell, who was consulted by Mr. Kendrick about making the will, visited him while he was in the hospital. Mr. Kendrick realized that he was a very sick man and seemed as if he wanted to talk to her about something but refrained because his nurse was present. Miss Fannie finally leaned over him and said: "Mr. Kendrick have you done something that you wish me to undo?" She was referring to the part she had taken in the preparation and execution of his will. Mr. Kendrick replied: "No, Miss Fannie, not that; I am perfectly satisfied with that." About that time his physician came in and no further conversation was had between the parties.

It is contended by counsel for appellants that he was referring to the fact that he had destroyed the will with the intention of revoking it. We think this is a strained construction to put on his language, because Miss Mitchell had not seen him since the execution of the will and he must have known that she referred to the part she had taken in that. This was the only transaction she had ever had with Mr. Kendrick. She was not interested in the provisions of the will in any way and evidently intended to help him undo what she had helped him to do if he had so wished it. He told her that he was perfectly satisfied with his action, evidently referring to the only transaction they had ever had—her assistance in the preparation of his will.

Henry Condell also testified that Mr. Kendrick, after he became sick and within five days of his death, told him about the execution of the will and expressed himself as satisfied at having executed it. There was no contradiction of any of these witnesses. None of them except Henry Condell had any interest whatever in the result of the suit. There is no circumstance tending to affect the veracity of any of them. There is no evidence

tending to show dissatisfaction on the part of Mr. Kendrick that he had executed the will or any wish or attempt to change it. On the contrary he made declarations of satisfaction at having executed it in the hospital when he knew he was facing death. The will was made within two months of the testator's death and after deliberation on his part. It was proved by several disinterested witnesses, who had known Joseph Kendrick well for many years, that he was a man of great force of character; that he was slow to make up his mind; but that, once having determined upon a course of action, he never changed his mind. After its execution he made repeated declarations of his satisfaction at its execution and the provisions of it up to within a few days of his death. Thus he recognized its continued existence. There was no excuse whatever for him to have spoken falsely in this respect. The witness who could have benefited directly by him making a will was his wife's nephew who was absent in the army. None of the other persons who assisted him in the preparation and execution of the will had any interest in the matter except to carry out his wishes.

(8)    The chancellor after weighing the evidence was of the opinion that the facts justified him in establishing the instrument as a lost will to the end that it might be admitted to probate as provided by the statute. It was not indispensable that he should determine what became of the will. It was enough that he should find that it was not revoked or canceled by the testator.

(9)    It is our duty to uphold the findings made by the chancellor unless the court is of the opinion that they are not sustained by a preponderance of the evidence. This we cannot do. It is not a question of whether the testator should have recognized that his blood relatives were objects of his bounty and should have given his property to them. It is not claimed that he was not competent to make a will and he had the right to dispose of his property as he wished. It does not make any difference that we might think that the testator should have

disposed of his property to his relatives as being in accord with the principles of natural justice and affection. No court has a right to dispose of a man's property contrary to his intentions or to change or revoke a will which he has deliberately made. After reading and considering all of the evidence, we are of the opinion that it cannot be said that the findings of the chancellor are against the preponderance of the evidence, and the decree must be affirmed.